310-0433 in re to Marriage of Elizabeth Jorgenson, Appellee Teresa Sosala, versus Mark Jorgenson, Appellant James Schultz. Please proceed. Good afternoon. The issues presented in the court's view from the appellant is the fact that there was evidence that was presented to the court in the form of testimony and exhibits, and that the finding of the court is inconsistent with that evidence in the form of testimony and exhibits that were presented to the court. One of the issues in this case that I think created a problem for the court was the fact that this case was heard on four different dates. And the volume of the record was substantial, and I'm certain the court's had an opportunity to review the record, but in this case there's 400 pages or more of record. The exhibit one that was presented to the court by the appellant pertains to the transfer of property between the appellant and the appellee during the marriage. Exhibit one was prepared by CPA Brian Neff, and Mr. Neff traced the transfers of property and money between the respective states by clear and convincing evidence. And the court itself noted that as a matter of record, that the court found that Brian Neff had in fact traced the money between the respective states by clear and convincing evidence. Throughout the testimony in this case, the appellant was resolute that there was never any intention on his part that these large transfers of funds and monies from his premarital estate to the appellee's premarital estate, and from his premarital estate to the marital estate, and from the marital estate to the petitioner's premarital estate, that there was never any intention that those transfers between the respective states would not be reimbursed or compensated. That evidence was conflicting, though, between the testimony of the two people, right? Well, the petitioner in this case took the point of view that, well, Mr. Jorgensen just gave me all these gifts to me, and I just took them. But as the court noted, in the Thacker case, where you have a contribution by a premarital estate to the other party's premarital estate, and it is a substantial amount of money, such that it essentially constituted the entire premarital estate of Mr. Jorgensen in this case. And one of the factors that the court noted in the Thacker decision is that it's not a normal circumstance that an individual would take their entire premarital estate and transfer it to the other individual's premarital estate without expecting compensation or reimbursement. And that is precisely what we have in this particular case, and it's evidence presented in the form of testimony and exhibits. But isn't the law exactly the opposite presumption? I mean, that unless you can demonstrate that you specifically intended not to make that a gift to the marriage and transmute all of that, that it is a gift, and that it does become part of the marital assets in the state. That's correct. Unless there was no intention to make a gift. That's an affirmative duty. I mean, that he has. Not just saying, well, it was a lot of money, and so, of course, there would be an expectation of getting it back. Why don't you need either a loan document or a conversation or something else that indicates that? Well, again, the record of this case and the testimony are a substantial number of portions of the record that support the fact that money was always an issue in this case, always an issue for these parties. In fact, these parties were married on July 24th of 99, and they separated on October 1st of 2002. And then they didn't reside together again until several months later. And, in fact, during the entire term of this marriage, the parties only lived together and cohabited 55 months out of 124 months. And the evidence that was taken of Dr. Witherspoon and the testimony in the court, the petitioner herself noted that money was always an issue in this case and that they were always constantly discussing money and the money that had been contributed from the premarital estate to her premarital estate and from his premarital estate to the marital estate and from the marital estate to her premarital estate. And that's what created the conflict in this marriage, and that's why these parties were separated more than they were together, was because of the fact that the respondent, Mr. Jorgensen, was resolute that he anticipated and had an expectancy and that the petitioner in this case knew he had an anticipation and expectancy that he was going to be reimbursed and compensated for these monies that went from his premarital estate to the respective estates. She denied that. No, there's evidence before the court that she understood or had an opinion at one point or had an expectancy she was going to sell our Germantown, Tennessee property and compensate Mr. Jorgensen or reimburse him by selling her premarital residence in Germantown, Tennessee, and then using the proceeds from that sale to reimburse Mr. Jorgensen. At another point in the record, there's evidence that Mr. Jorgensen, the petitioner in this case, had considered getting into an investment business in the state of Florida, and there was an anticipation on the part of the respondent in this case that the money, and the petitioner in this case, that the money from the investment in the Florida business would somehow come back to the respondent to reimburse him. And for monies that were transferred between the respective estates. There's other evidence and testimony in this case that the petitioner, Ms. Jorgensen, also started a business that was entitled Senior Elite Care, and that there was an anticipation and an expectancy between Mr. Jorgensen and Ms. Jorgensen that that business would provide a source for reimbursement or for compensation of Mr. Jorgensen. And in fact, that's one of the issues that was always before the parties in this case. That's what led to them, in fact, separating on multiple occasions. And Mr. Jorgensen testified specifically that it was never his intention that these large transfers of monies or funds between the respective estates would not be reimbursed or compensated. Ms. Jorgensen, on the other hand, when she testified, her response was that there was some anticipation that the Germantown, Tennessee property would be sold, that Mr. Jorgensen would be reimbursed out of that sale. And in fact, there's evidence that's submitted to the court in the form of exhibits that had email communications between Ms. Jorgensen and Mr. Jorgensen. And talked about her understanding or her anticipation that there would have to be some mechanism available to make reimbursement to Mr. Jorgensen from Ms. Jorgensen's premarital property. Now, I'd like to also note for the court that this was Ms. Jorgensen's fourth marriage. And the evidence here is that Ms. Jorgensen spent more time away from Mr. Jorgensen during the marriage than they spent together. And the reason, again, for that was the fact that they were fighting over the fact that she wasn't compensating him or reimbursing him for monies that he had taken from his premarital estate to pay off her monies and her debts. And I would note for the court that the case of the marriage of McCoy, which is a Third District 1992 case, the reviewing court noted that the IMDA secures a right of reimbursement for contributions made by one estate, which have enhanced the value of an item of property classified as belonging to another estate. Here's exactly what happened. Mr. Jorgensen took his premarital assets to pay Ms. Jorgensen's premarital debts. He took his premarital assets to make transfers to the marital estate, and he took his marital estate and made transfers again to enhance Ms. Jorgensen's premarital estate by paying debts and expenses that she had accumulated prior to the marriage. Hence, the value of her premarital estate by having those debts and liabilities paid was enhanced. We believe that the court should find that those transfers between the respective states should require a reimbursement to Mr. Jorgensen as part of the division of the property and the assets in this case. And again, I think one of the more complicated issues in this type of case normally is the fact that there's no clear and convincing identification of the transfers between the respective states. But in this particular case, we had CPA Brian Neff, who painstakingly took many, many hours to trace, by clear and convincing evidence, all those transfers between the respective states. And in fact, he testified, and the court noted during the testimony that the court found his testimony to be compelling, and that he believed that CPA Brian Neff had, in fact, properly and accurately traced all of the transfers between the respective states. As the fact of the case notes, again, what he had was a circumstance here where if it's a small amount of money transferred in the form of a gift, it's easy to understand how that might be the case. But in this case, it essentially took the respondent's entire premarital estate and transferred it to the marital estate and to Ms. Jorgensen's premarital estate. Who did that transfer? Pardon me? Who did the transfer? Mr. Jorgensen. But again, there was an agreement between the parties and an anticipation and an expectancy on the part of both parties that there would be reimbursement or compensation. But doesn't, even your client testifies that he was asked about whether or not there was an agreement about the non-marital fund, the use of his non-marital funds for her non-marital debt. And he responded, over time, it evolved. And that initially, you know, he talks about that they had conversations, evolved over time, and ended up whereby she did, in fact, have the property on the market. Doesn't the, doesn't at the time that the money's transferred, doesn't it have to at that point in time, the intent not to make it a gift? Absolutely. And that's what we had here. But I think what Mr. Jorgensen stated in his comment is what evolved over a period of time is what mechanism was available to provide for reimbursement or repayment. I mean, your client's not a non-educated man, right? Yes, sir. And he's in a business, in fact, that he certainly don't understand the law of contracts, right? Yes, sir. So he could have protected himself. And people sometimes get in love and don't often do that. They make bad deals for themselves. But here's a man in the service of education and even occupation ought to understand contracts. And if he wants to make sure he gets himself reimbursed, he has somebody sign a note. He didn't. So that leaves us with a question of fact. Yes, sir. For the Trier effect, doesn't it? Well, again, the statute of frauds can't be asserted as a defense here. And the court has so held that the fact that there's not a promissory note or a contract, the parties had an understanding and an expectancy that there was supposed to be reimbursement back, Mr. Jorgensen's premarital estate. That's the last two minutes. Okay. Thank you. It doesn't have to necessarily be reduced to writing, although. Well, except he says there was an agreement and she says there wasn't. So somebody's got to decide who's telling the truth. Well, I think what really addresses that issue is that Mr. Jorgensen testified throughout the marriage that this was an issue that was constantly creating stress in the marriage because he expected to be compensated and reimbursed, but it didn't happen. And there was a growing distrust between the two of them based upon the fact that she said you'll be repaid every penny, but it didn't happen. And then she said I'll pay you out of the Germantown property, but it didn't happen. And then she said she'd pay it by the Florida investment. It didn't happen. Then she said I'll pay you out of the senior elite care, and it didn't happen. There was an expectancy on both of their parts, and Daryl testified that she knew there was an expectancy that that money would be reimbursed or repaid, and she testified that for a period of time she had the Germantown, Tennessee property on the market. And that was the reason that it was being listed for sale was so that it would create a source of funds that would address Mr. Jorgensen's desire to be compensated and reimbursed. Any other questions? Thank you. Counsel. Good afternoon. Terri Sasala. I'm with the NEPA law firm, and I'm appearing on behalf of the appellee. In preparing for this argument today, I always try to cut to the chase in what I think is the most compelling issue that the court needs to consider in making a decision, and one that I don't feel was adequately addressed in the appellant's argument is that the standard of review in this case is whether the trial court's decision is against the manifest weight of the evidence. And I think some of the questions that came from the panel are an indication that based upon this record, one cannot say that this decision by the trial court was against the manifest weight. In fact, the trial court's opinion, which is in the appendix reproduced beginning at page A10, very clearly lays out his review of the law and the evidence in reaching his decision. And that decision is based significantly on his evaluation of the credibility of the evidence that was presented to him. He's not bound to believe every word that a witness testifies to. He has the opportunity to observe demeanor, put together pieces of the puzzle, and come to a conclusion regarding who he finds more credible. And in this case, I think he very reasonably reached the conclusion that these parties, well, I'll strike that. Mr. Jorgensen regrets his generosity and now in hindsight seeks to change the nature of the transfers that occurred during the course of the marriage. Now, a question was presented that really hailed back to contracts law, and I came to this conclusion that this is what's lacking in this case. There was no meeting of the minds as it related to Mr. and Mrs. Jorgensen and how these monies were going to be repaid. And there's many, many aspects in the record that would support the conclusion that there was no meeting of the mind. But first and foremost, the law is, there is a presumption of a gift. And so it was Mr. Jorgensen's burden to rebut that presumption. And that is on page A13 as the court cites in his opinion. A contribution of funds of one estate to another creates a presumption of gift which can be overcome by clear and convincing evidence that a gift was not intended. This court finds that the presumption has not here been rebutted. His statement that, quote, it was not my intent, comma, generally, to give her gifts, end quote, is far less than clear and convincing. Again, there are many aspects of that that would tend to support the judge's decision. For example, there is no documentation of these loans. And to me, $352,000 is a lot of money. And if you had an expectation to have that money repaid to you, you would take great care to document that expectation. In fact, there were some loans that were recognized by the court because there was documentation of an intent to be repaid. Those were for relatively small amounts. I believe it was $5,000. So- Were those kind of after the breakdown? Yes, yes. That's another point. Let me ask another thing. The presumption, does that presumption apply before they're married? I believe, as Justice O'Brien indicated, it's at the time that the gift was made. So- If you don't document it, I would say yes. Because, you know, particularly in anticipation of marriage, because there is a certain relationship that's created even in anticipation of marriage. So under those circumstances, yes. I would not give someone $120,000 if I expected to be repaid and not have something that I can enforce in court in order to do that. That's what a prudent person would do. So from- And the court has also noted that this is a sophisticated gentleman. He knows how to conduct his serious affairs, particularly as they relate to business, and could have done that. The issue of the statute of frauds is well addressed in the brief, but I won't go into that in depth here. There's also a question regarding what reasonable expectation did he have to be repaid? She didn't have a job. She has health problems. She- If he expected to be repaid from the sale of the home, why didn't he just have her sell the home and pay the debts? It doesn't really flow that that expectation existed at the time. As it relates to the sale of the house, you could also say, well, that was a condition, a condition precedent to him being repaid, and that condition never occurred because the sale never happened. Why it didn't happen, we can't say. However, if you put a condition solely in the hands of one party to either allow that condition to occur or not, and they prevent that condition from being occurring, well, they've also prevented their performance under the contract. I found this to be a very interesting examination of my first contracts class in law school. These are some very fundamental principles of contract law. With regard to the 5,000 and the 19,000, the 5,000 appeared to be taken care of by the trial judge. Yes, he did. But with regard to the 19,000, it would be the, your argument is that that would come under the same presumption? Mm-hm. So it's a question of the trial court, if it's against the manifesto of the evidence, the trial court's ruling on the 19,000. Now, as to the 5,000, there was a written document. Right. But not as to the 19,000. No. And there's not quite the same kind of conflicting testimony as to the 19,000. But as to the 19,000, your client is indicating that she was strapped for money, had no support, and it's between a rock and a hard place. Yes, yes. And that can create a, as the court says, a rock and a hard place. She has no other source of funds to meet her daily needs and requirements of living. And, frankly, he is her husband. He still does owe a duty of support. They are not divorced at the time that those funds were transferred. But they didn't go into court. This is after the proceeding file, wasn't it? I would have to review the record specifically to get that timing correct. Mm-hm. But I think, once again. Well, there's a separation, I guess. Well, the parties had been separated periodically throughout their marriage. And I would say that in this day and age, that really doesn't lead to any conclusion. Marriage is not really defined and performed in the same manner that it might have been 50 years ago, where mom and dad are both under the same roof. Well, I shouldn't say mom and dad, husband and wife. And, you know, with the mobility and transportation, the fact that they spend a significant amount of time apart does not necessarily mean that they do not continue to consider themselves husband and wife. And they certainly had maintained that relationship. Mr. Jorgensen was free to have filed a dissolution of marriage at any time. From a common sense standpoint, what sense does it make for any married person to make a large donation to the non-marital estate of their spouse? What in the world could be the motivation for that? Love, Your Honor. Pure and simple. Love. People do really kooky things. And again, there was a very easy way for Mr. Jorgensen to protect himself. And that was to get some of these agreements in writing. Alternatively, if the sale of that home was going to be the source of the funds to pay those debts, he could have said, Honey, I'm not going to pay you the money. You have an asset to pay those debts with. You sell that asset. He did not do that. And that's really very, I think, telling in regard to his generosity. Generosity he may now regret, but we still have to look at the intent of the parties and whether there was a meeting of the minds. And again, I stress that the court, the trial court, having had the opportunity to view the parties, is charged with the authority to make decisions regarding that credibility. And it's not a reviewing court's province to step in. If it's against the manifest weight of the evidence, that's where you come in to make sure that the right result is reached. But under the facts of this case and the conflicting evidence that was presented, the trial court did not abuse his discretion. And his decision was not against the manifest weight. I'd like to just make one other point, and I believe it was Justice O'Brien that asked a question. In talking about even trying to define the agreement that the parties had, Mr. Jorgensen made comments like it evolved over time. And that's, again, there is no definitive meeting of the minds for these parties, which regardless of the fact that it's a fundamental principle of contract law and seems very basic, is still a necessity before a contract, which is essentially what Mr. Jorgensen is seeking to enforce here, can be enforced. There's a lot of cases where somebody, one spouse, has a non-marital residence. Let's say it's a cabin in the woods or something, and they go up and it's a non-marital house, and they pay the taxes on that, and somebody puts a new roof on it, a new siding or something. The end of the divorce comes, and you say, well, generally the law is, well, any funds spent to enrich that non-marital estate got to be considered a loan to the non-marital estate, and you get credit for it in the divorce. It doesn't turn the non-marital estate, that cabin in the woods, into marital property. It's just a loan subject to reimbursement or set off in the divorce. Does that line of thinking have any play here with respect to the money spent on the house in Tennessee? Well, I would argue, Your Honor, that it did not, and that is in line with the testimony of the parties and the credibility that the trial court assessed amongst those people. I don't think that decision is necessarily a question of law. It's a question of fact. And in the court's ruling, as he did, he made a decision that factually he did not find that reimbursement was mandated under the facts of the case. There were no arguments in this case about transportation. This was a question about reimbursement. Correct. And then finally, I just would state, hindsight is always 20-20. And that is the basic summary, I would say, regarding the issues that have been raised by Mr. Jorgensen. At the ultimate breakdown of the marital relationship, he wished he could go back in time and change some things. But the fact is, we don't get that benefit. We have to rise or fall on the facts as they exist at the time that decisions are made, at the time that gifts are given. And while we may later change our mind and find that to be improvident, that does not mean that the outcome of our decisions is not going to be what binds us at the end of the day. Were there any questions? Thank you, Counselor. Counselor. The points that the Court made during its questions to Mrs. Ecker, especially pertinent to understanding what happened in this case. What we have is Daryl Jorgensen, who's a serial marrier, who's been married three times before, and this is her fourth time, and she knows the routine, and she knows how to play the game. He knew she was a serial marrier when he married her? Correct. And when they got married, she said, I need money to pay this premarital debt. She says, I'll pay, I'll sell my house and we'll reimburse you for paying off my premarital debt or for paying my premarital debt. When that didn't happen, what happens? The party gets married in 99. He realizes and she realizes that the jig is up in October of 02, and so they separate because she wants to go back to Tennessee and preserve her Tennessee home and not have to sell it pursuant to their agreement. As the court noted, later in the marriage, every time there was any money transferred by Mr. Jorgensen to Mrs. Jorgensen, he wanted a piece of paper signed. He wanted something put in writing that said this is $5,000, this is $9,000, this is $1,200. He wanted it in writing because her representations to him during the marriage that she was going to sell this property and reimburse him or that she was going to make money in the Florida investment and reimburse him, that didn't apply anymore. And consequently, the party's marriage became extremely estranged, and that's why they spent more time apart than together because Mrs. Jorgensen didn't believe what she told him anymore. She induced him to take his premarital assets and transfer them to her premarital debt with the understanding that she was going to reimburse or repay him. That didn't happen. There was never any intention on the part of Mr. Jorgensen to take his premarital estate and pay off her premarital debt without some expectancy of being compensated. And that didn't happen. That's why the parties are divorced. That's why the parties separated four times during the marriage is because every time that Mr. Jorgensen put heat on Mrs. Jorgensen to carry through on her representations and to sell her property in Tennessee and reimburse Mrs. Jorgensen, she didn't want to do it. Why do it? Why did they get back together again those three times? Well, because she gave representations and she was going to follow through on what she had promised to do, and she didn't do it. And then as it evolved over time, she said, okay, we'll invest in this Florida investment. That'll make money that I can compensate. Then as it evolved over time, she said, I'm going to have to cede your elite care, and that's going to make money, and I'll compensate you out of there. It didn't make money? No. I know. But again, that was the thought process, and that was what the parties were thinking. It sounds a little bit to me like a little bit of an Adam and Eve story, and Eve's taking all the blame. And this guy in 02, when you say, hey, he knows the jig is up, he said, you know what? You either pay me if this was their agreement or we're done. But obviously, like you said, they keep getting back together, and it seems from that point on, then there are written documents. And perhaps he just figured it out, but just because he figured something out in 2002 doesn't mean he can go back and get a do-over from 1999. Maybe she was very good at this game and tricked him, as you say, but if he really made a gift, he can't go back and say our agreement evolved over time. It's got to be at the time he made the gift. But I think the courts take that out of context. When he says it evolved over time, what evolved over time was what mechanism was going to facilitate the reimbursement, not what the agreement was between them as to the transfer of funds. What evolved was what mechanism was going to facilitate the reimbursement. Well, the petition for dissolution was first filed in February of 07. Well, she first filed a petition in Tennessee back in 03. I mean, the Illinois was filed. Yes, sir. That's correct. Who filed it? Pardon me? Who filed that? Ms. Jorgensen filed it. Again, I would just like to point out, our reply brief addressed the issue that the issue concerning the statute of frauds was never raised in this case in the trial court. And that issue cannot be raised for the first time in this court. And there's case law that says that's not even an issue and shouldn't be an issue for this court. That was never an action. There was never any issue to whether something was reduced in writing or whether it was in writing. And as the court knows, that can't come before this court for the first time on appeal. I thank you for your time. Thank you, counsel. The court will take this case under advisement and rule with dispatch. We will now adjourn for the day.